## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 23-11919-MER |
| BIGHORN RESTAURANTS, LLC | ) | |
| EIN: 35-2489713 | ) | Chapter 11 |
| | ) | |
| Debtor-in-Possession. | ) | |
| In re: | ) | |
| | ) | Case No. 23-11921-MER |
| SUMMIT RESTAURANT HOLDINGS, LLC | ) | |
| EIN: 35-2488578 | ) | Chapter 11 |
| | ) | |
| Debtor-in-Possession. | ) | |
| In re: | ) | |
| | ) | Case No. 23-11922-MER |
| EMPIRE RESTAURANTS, LLC | ) | |
| EIN: 32-0423213 | ) | Chapter 11 |
| | ) | |
| Debtor-in-Possession. | ) | |
| In re: | ) | |
| | ) | Case No. 23-11924-MER |
| HEARTLAND RESTAURANTS, LLC | ) | |
| EIN: 80-0962321 | ) | Chapter 11 |
| | ) | |
| Debtor-in-Possession. | ) | |
| In re: | ) | |
| | ) | Case No. 23-11925-MER |
| ATLANTIC STAR FOODS, LLC | ) | |
| EIN: 47-2136486 | ) | Chapter 11 |
| | ) | |
| Debtor-in-Possession. | ) | |
| In re: | ) | |
| | ) | Case No. 23-11926-MER |
| SUMMIT RESTAURANT | ) | |
| DEVELOPMENT, LLC | ) | Chapter 11 |
| EIN: 47-2810472 | ) | |
| | ) | |
| Debtor-in-Possession. | ) | |

{Z0412067/1 }

1

4874-6595-1841, v. 1

## DECLARATION OF DANIEL F. DOOLEY IN SUPPORT OF FIRST DAY RELIEF

I, Daniel F. Dooley, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury:

1.      I am the Financial Advisor ("FA") of Summit Restaurant Holdings, LLC.  In this capacity, I am familiar with the day-to-day operations, businesses, financial affairs, and books and records of Bighorn Restaurants, LLC ("Bighorn"), Summit Restaurant Holdings, LLC ("Summit Holdings"), Empire Restaurants, LLC ("Empire"), Heartland Restaurants, LLC ("Heartland"), Atlantic Star Foods, LLC ("Atlantic"), and Summit Restaurant Development, LLC ("Summit Development") (collectively, the "Debtors").  I have decades of senior leadership experience in the food, restaurant, automotive, aerospace, capital equipment, healthcare, transportation, metals, oil & gas and real estate industries.  In addition to serving as FA of the Debtors, I am a Principal and CEO of MorrisAnderson & Associates, Ltd. ("MorrisAnderson") where I manage the distressed business consulting practice.

2.      I submit this declaration (the "Declaration") in connection with the Debtors' voluntary petitions (the "Petitions") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") filed in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court") on the date hereof (the "Petition Date").  I further submit this Declaration to provide an overview of the Debtors and their chapter 11 cases and to support the Debtors' applications and motions for "first day" relief.

3.      I am familiar with the business and financial condition of the Debtors and, except as otherwise indicated herein, the facts set forth in this Declaration are based on my personal knowledge, my review of relevant documents, information provided to me by the Debtors'

2

management, employees or professionals, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the industry in which they operate. Unless otherwise indicated, all financial information contained herein is presented on an estimated and unaudited basis. I am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## I.  SUMMARY OF THE DEBTORS AND BUSINESS OPERATIONS

### A.  Nature of the Debtors' Business and Corporate Structure.

4.      Together, the Debtors constitute one of the largest current franchisees of Hardee's restaurants. The Debtors formerly operated over 145 Hardee's restaurants; the Debtors recently closed 39 restaurants and currently operate 108 Hardee's restaurants (the "Restaurants"). The Restaurants span the states of Alabama, Florida, Georgia, South Carolina, Kansas, Missouri, Wyoming and Montana. The Debtors are part of a larger group of affiliated companies (the "Capstone Group") that operates and franchise over 226 restaurants in 16 states through a variety of brands, including Hardee's and Carl's Jr.

### B.  Corporate Formation and Structure.

5.      Debtors Summit Holdings, Empire, Heartland, Bighorn, and Atlantic Star are Delaware limited liability companies formed under the laws of the State of Delaware. Debtor Summit Development is a Colorado limited liability company formed under the laws of the State of Colorado.

6.      Summit Holdings is a holding company and the sole member and 100% owner of Debtors Empire, Heartland, Bighorn, Atlantic Star, and Summit Development. The sole member and 100% owner of Summit Holdings is LB Summit, LLC. LB Summit, LLC is managed by

3

Dewey R. Brown and Todd Pahl.  Dewey R. Brown and Todd Pahl also manage Summit Holdings, Empire, Heartland, Bighorn, Atlantic Star, and Summit Development.

7.      Attached to this Declaration as Exhibit 1 is a corporate organization chart of the Debtors.

8.      The Debtors' shared principal offices are located at 7490 Clubhouse Road, Floor 2, Boulder, Colorado 80301.

9.      Copies of the corporate resolutions authorizing the filing of these chapter 11 cases by each of the Debtors are attached to their respective petitions and incorporated by reference herein.

**C.  Franchise Agreements and Leases.**

10.      Each of the Restaurants is subject to its own Restaurant franchise agreement, by and between CKE Restaurant Holdings, Inc. ("CKE") and the applicable operating subsidiary Debtor, Empire, Heartland, Bighorn, and Atlantic Star (collectively, the "Franchise Agreements"). Pursuant to the Franchise Agreements, the Debtors are granted the right to operate the Restaurants using the Hardee's trademarks and service marks, and are provided certain operational support from CKE, in exchange for payment of certain royalties and advertising contributions to CKE in accordance with and subject to the terms and conditions of the Franchise Agreements.

11.      Each of the Restaurants is also subject to its own lease agreement (the "Lease Agreements") by and between the applicable operating subsidiary Debtor and the lessor of the property on which the Restaurant is located.[1] Summit Holdings provided guarantees of the operating subsidiary Debtors' obligations under certain, but not all, of the Lease Agreements.

---

[1] Twenty-two Restaurants are included in two master leases, whereby multiple locations are covered by a single master lease.

4

**D.  Prepetition Indebtedness.**

12.     Cadence Bank, formerly known as Cadence Bank, N.A., is the Debtors' senior lender.  Prior to the Petition Date, Lender made a loan in the amount of $21,465,649 (the "Loan") as evidenced by that certain Term Loan Note dated December 9, 2020 in the original principal amount of $21,465,649 (the "Note").  In connection therewith, Debtors and Cadence Bank entered into a Loan and Security Agreement, dated December 9, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").  The Credit Agreement, the Note, amendments thereto, and all documents, instruments, and agreements executed in connection therewith or related thereto are hereinafter referred to as the "Loan Documents."

13.     Pursuant to the Loan Documents, the Debtors incurred loan obligations (the "Secured Obligations") in favor of Cadence Bank.  Those Secured Obligations were in default as of the Petition Date.  As of the Petition Date, the Secured Obligations owed to Cadence Bank, without defense, counterclaim or offset of any kind, totaled no less than $22,121,060, plus accrued and unpaid interest with respect thereto and any additional fees, costs, expenses, and other obligations incurred in connection therewith due under the Loan Documents.

14.     As set forth in the Loan Documents, as security for the Secured Obligations the Debtors granted to Cadence Bank a first-priority valid, perfected and enforceable security interest (the "Prepetition Liens") against all collateral previously pledged by the Debtors and previously perfected by Cadence Bank as of the Petition Date to secure repayment of the Secured Obligations under the Loan Documents (the "Prepetition Collateral").[2]

---

[2] Prior to the commencement of these chapter 11 cases, Bighorn, Empire, Heartland and Atlantic Star each executed and delivered Purchase Money Security Agreements in favor of Meadowbrook Meat Company, Inc. ("Mclane") granting to it a security interest in all inventory delivered by McLane to each of Bighorn, Empire, Heartland and Atlantic Star (the "Mclane Inventory").  Mclane perfected its security interests in Mclane Inventory by filing UCC-

5

15.     Debtors believe that Cadence Bank is an undersecured creditor, namely that the value of the Prepetition Collateral is less than the Secured Obligations.

### E.  Other Prepetition Liabilities.

16.     I understand the Debtors have estimated unsecured debt in the aggregate amount of approximately $6 million as of the Petition Date. There are amounts due to CKE pursuant to the Franchise Agreements for royalties, advertising contributions and other amounts to CKE. There are also amounts due to landlord under the Lease Agreements. Certain more limited prepetition amounts are also owed to vendors.

## II.    CIRCUMSTANCES AND EVENTS LEADING TO FILNIG.

### A.  Circumstances Leading to Filing.

17.     Over the past several years, and particularly as a result of the COVID-19 pandemic, franchisees system-wide have experienced declining foot traffic. The Debtors' business also suffered significantly from loss of foot traffic, resulting in declining revenue without proportionate decreases in rental obligations, debt service, and other liabilities. External pressures resulting from the pandemic, including recent increases in wages  and the cost of labor, shipping and food inflation, decreased availability of labor, and inflation generally have driven the Debtors' cash flow issues.

18.     Many of the Restaurants were underperforming restaurants which demonstrated an

---

1 financing statements against each of Bighorn, Empire, Heartland and Atlantic Star.   Debtors believe that Mclane has a first priority security interest in the Mclane Inventory, which secures the amounts due and owing to Mclane for the Mclane Inventory, which Debtors' estimate to be approximately $775,000.  This amount represents the amounts due for goods received by the Debtors within ten days immediately preceding the Petition Date.  Debtors propose to pay these amounts in full as more fully set forth in the *Debtors' Motion For Entry Of Interim And Final Orders Authorizing, But Not Directing, (I) Payment Of Prepetition § 503(B)(9) Claims, (II) Payment Of Prepetition Claims Arising Under The Perishable Agricultural Commodities Act And The Packers And Stockyards Act Of 1921, And (III) Granting Related Relief.*

inability to grow annual volumes. These lower volumes resulted in smaller profit margins and thus greater sensitivity to the recent dramatic rise in labor, commodity prices, and maintenance costs. As a result, although certain of the Restaurants are profitable, others were operating at a loss for a prolonged period of time, resulting in the Debtors' inability to meet financial obligations timely.

**B.  Prepetition Restructuring Efforts.**

19.     Approximately six weeks prior to filing, the Debtors engaged Brookwood Associates, LLC ("Brookwood") to act as investment banker to provide investment banking services to market the Debtors' assets (the "Prepetition Marketing Process") in connection with the sale of all or a part of the Debtors (the "Sale Transaction").

20.     In connection with the Prepetition Marketing Process, Brookwood was engaged to, among other things: prepare confidential informational memoranda and marketing materials as may be appropriate for distribution to potential lenders, investors, or purchasers; assist the Debtors in developing and managing a due diligence process, including compiling a data room of necessary and appropriate documentation and information related to a potential Sale Transaction; assist the Debtors in identifying and screening potential buyers; assist in soliciting and evaluating offers from potential buyers; and advise and assist the Debtors with a sale and negotiation of transaction agreements and assist the Debtors and their professionals, as necessary, through a closing of a sale.

21.     Prior to the Petition Date, the Debtors entered into an Asset Purchase Agreement with that certain buyer as the proposed initial "stalking horse" bidder to purchase substantially all of the Debtors' assets subject to this Court's approval and in accordance with 11 U.S.C. § 363.

22.     During this time, I have worked with management, my MorrisAnderson team, and the Debtors' other advisors, to prepare for the filing of these chapter 11 cases.  I am therefore

familiar with the Debtors' voluntary chapter 11 petitions, the motions being filed with the petitions, and other pleadings filed at substantially the same time as this Declaration.

### III.  SUMMARY OF THE DEBTORS' CHAPTER 11 REORGANIZATION.

23.    The Debtors filed these chapter 11 cases to complete the contemplated Sale Transaction on an expedited basis.  The Debtors anticipate entering into an asset purchase agreement with a "stalking horse" bidder to purchase substantially all of the Debtors' assets subject to this Court's approval and in accordance with 11 U.S.C. § 363.

24.    With the Prepetition Marketing Process in mind, and in an effort to maximize value for all stakeholders, the Debtors have developed postpetition marketing, bidding and auction procedures (the "Bid Procedures") for the orderly marketing and sale of the Debtors' business. The Debtors anticipate filing a motion for approval of the Bid Procedures soon after the commencement of the chapter 11 cases (the "Bid Procedures Motion").  The Bid Procedures are designed to promote a competitive and robust bidding process and are intended to generate the greatest level of interest in the Debtors' business.  The Bid Procedures provide the Debtors with flexibility to solicit proposals, negotiate transactions, select qualified bidders, hold an auction, and proceed to consummate a potential sale transaction whether through a 11 U.S.C. § 363 sale or through a chapter 11 plan, all while protecting the due process rights of all interested parties and ensuring that there is a full and fair opportunity to review and consider proposed transactions.

25.    The Debtors, in consultation with their professionals, believe that to accomplish the highest return for an auction and sale and to facilitate the assumption and assignment of certain unexpired leases within the deadlines set forth in the Bankruptcy Code, the sale must close in August 2023.  In addition, the consensual deferral of royalty and advertising payments during the Cash Collateral Budget period afforded to the Debtors by their franchisor to facilitate an expedited

8

sale process is temporary.  Thus, time is of the essence for the sale of the Debtors' business and the Debtors seek to schedule a final hearing on the Bid Procedures Motion on an expedited basis to facilitate the timeline for closing in August 2023.

26.     Accordingly, the Debtors intend to seek approval of certain critical path dates regarding the Debtors' need to close on the sale of its assets by August 2023.  The Debtors will seek the entry of an order (i) scheduling a final evidentiary hearing on the Bid Procedures Motion within twenty-one (21) days from the Petition Date as soon as the Court is available, and no later than May 25, 2023, and (ii) setting a deadline for any responses or objections to the Bid Procedures Motion.  The failure to promptly hear the Bid Procedures Motion and launch the bidding, auction, and sale process at the outset of these chapter 11 cases would have immediate and detrimental consequences to the Debtors' continued business operations, would jeopardize the prompt sale of substantially all of the Debtors' assets and the Debtors' efforts to preserve and maximize the value of their estates, to the detriment and prejudice of all of the Debtors' stakeholders.  The Debtors' failure to expeditiously move toward a sale and address assumption and assignment of certain unexpired leases would cause the Debtors' estates immediate and irreparable harm by forcing the Debtors to assume or reject unexpired leases for non-residential real property and take the risk that any assumed leases would be assigned to a willing buyer.

## EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS

27.     To enable the Debtors to operate effectively and minimize potential adverse effects during the Chapter 11 Cases, the Debtors are requesting certain "first day" relief in various motions and applications filed with the Court concurrently herewith (collectively, the "First Day Motions"). This relief is critical to the Debtors' efforts to preserve and maximize value for the benefit of

creditors and is intended to minimize the potential adverse effects that commencement of the chapter 11 cases may have on the Debtors and their business operations.

28.     I am familiar with the contents of each First Day Motion and the exhibits thereto, and believe the relief sought in each First Day Motion is: (a) necessary to preserve and maximize the value of the Debtors' estates; (b) essential to the successful reorganization of the Debtors; and (c) serves the best interests of the Debtors, their estates, their creditors and other parties in interest. Additionally, and as set forth more fully below, I believe immediate entry of the relief requested in the First Day Motions is necessary and critical to the Debtors' financial restructurings, preserving the value of their business operations for the benefit of creditors, and achieving a successful reorganization of the Debtors' business affairs.

A. **Joint Administration Motion.**

29.     On the Petition Date, the Debtors filed a *Motion for Order Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only and Entry of Related Relief* (the "Joint Administration Motion"), in the case captioned In re Bighorn Restaurants, LLC, case no. 23-XXXXX-ABC.  The Debtors seek entry of an order, pursuant to Bankruptcy Rule 1015(b), authorizing and directing, for procedural purposes only, the joint administration of the Debtors' chapter 11 cases.

30.     In the Joint Administration Motion, the Debtors request that the Bankruptcy Court maintain one file and one docket for all of the jointly administered chapter 11 cases under the case number assigned to Debtor Bighorn Restaurants, LLC and that these chapter 11 cases be jointly administered under a consolidated caption.

31.     The Debtors believe that joint administration of the Debtors' chapter 11 cases is warranted because the financial affairs and business operations of the Debtors are closely related.

10

Entry of an order directing joint administration of these cases will avoid duplicative notices, applications, and orders, and will thereby save considerable time and expense for the Debtors and result in substantial savings to their estates.  Moreover, I do not believe joint administration will adversely affect the Debtors' respective constituencies because the Joint Administration Motion seeks only administrative, not substantive, consolidation of the Debtors' estates.

32.     For these reasons, I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

**B.   Utilities Motion.**

33.     On the Petition Date, the Debtors filed the *Motion for Entry of Interim and Final Orders: (A) Approving Adequate Assurance of Payment to Utility Providers; (B) Establishing Procedures for Resolving Objections by Utility Providers; (C) Prohibiting Utility Providers from Discontinuing, Altering or Refusing Service; (D) Scheduling a Final Hearing; and (E) Granting Related Relief* (the "Utilities Motion").  In the Utilities Motion, the Debtors seek entry of an order: (i) prohibiting utility providers from altering, refusing, or discontinuing services; (ii) determining adequate assurance of payment for future utility services; (iii) establishing procedures for determining adequate assurance of payment for future utility services; and (iv) granting related relief, including authorizing certain payments to the third-party administrator that manages the Debtors' utility accounts.

34.     The requested relief, in my view, represents another critical piece to permitting the continued operation of the Debtors' business during the pendency of the chapter 11 cases without interruption.  The Debtors' Restaurants simply cannot function without water, sewer service, electricity, waste disposal, natural gas, and other similar services (collectively, the "Utility

Services") obtained from numerous utility providers or brokers (the "Utility Providers").

35.     I understand that the Debtors expect to pay approximately $460,000 per month in the post-petition period based on the average costs over prior twelve-month period and accounting for utility payments for stores that are permanently closed as of the Petition Date.

36.     The Debtors propose to satisfy postpetition obligations owed to the Utility Providers in the ordinary course of business.  Based on my work on the Debtors' budget and understanding of the cash generated in the ordinary course of the Debtors' business, the Debtors' will have ample liquidity to pay the Utility Services obligations in accordance with their prepetition practice and therefore the utilities should need no additional security.  But the Debtors are nevertheless proposing to provide Utility Providers with additional security in the form of a deposit into a segregated account of $250,000.00 (the "Adequate Assurance Deposit"), which represents an aggregate amount equal to more than one-half of the Debtors' anticipated monthly cost of Utility Services.

37.     In my experience and in discussing the issue with the Debtors' advisors, it is my opinion that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in accordance with their prepetition practices, constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of 11 U.S.C. § 366.

38.     Further, I believe that granting the relief requested in the Utilities Motion on an expedited basis is warranted under the facts and circumstances of the cases and is in the best interests of the Debtors, their estates, and creditors.  Entry of the relief requested on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors' estates and their business operations.  Any disruption in the Utility Services would cause immediate and irreparable harm to the Debtors' operations and the ability of the Debtors to move forward with their

12

reorganization efforts.

C. **Cash Management Motion.**

39.     On the Petition Date, the Debtors filed the *Motion for Entry of Interim Order Authorizing the Debtors to (A) Continue to Operate Their Cash Management System on an Interim Basis, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, (D) Setting a Final Hearing, and (E) Granting Related Relief* (the "Cash Management Motion").

40.     The Debtors request entry of an interim order (the "Interim Cash Management Order"): (i) authorizing, but not directing, the continued use of the Debtors' cash management system (the "Cash Management System"), bank accounts and business forms under the existing Cash Management System, honor certain prepetition obligations related thereto; (ii) waiving certain requirements of 11 U.S.C. § 345(b) and operating guidelines set forth in the Operating Guidelines for Chapter 11 Cases by the Office of the United States Trustee (the "U.S. Trustee Guidelines"); and (iii) scheduling a final hearing on the Cash Management Motion.

41.     The Debtors' Cash Management System, a diagram of which is attached to the Cash Management Motion as Exhibit 1, is similar to the centralized cash management systems used by other comparably sized multi-state quick serve restaurant companies to manage cash flow.  The Debtors use their Cash Management System in the ordinary course to receive, transfer and disburse funds and to facilitate payroll, operating expenses, taxes, cash monitoring, forecasting, and reporting.  The Cash Management System facilitates the timely and efficient collection, management, and disbursement of funds and allows the Debtors to accurately track cash flow on behalf of the entire business operation.

42.     Generally, cash and non-cash revenue generated at the Restaurants is deposited into

13

accounts maintained at banks local to the Restaurants and held by Empire, Heartland, Atlantic Star, and/or Bighorn (the "Restaurant Deposit Accounts").  Non-cash payments, via debit and credit cards, are credited directly to credit card accounts held and maintained by Atlantic Star, Bighorn, Empire, and Heartland (the "Credit Card Accounts").  Online purchases made from the Restaurants using non-cash forms of payments are also credited to the Credit Card Accounts.  Revenue is transferred and consolidated into a general operating account at Cadence Bank held and maintained by Summit Holdings (the "Operating Account").  Each business day, the balance in the Restaurant Deposit Accounts is automatically transferred to the Operating Account.  Likewise, each business day, the balance in the Credit Card Accounts is transferred to the Operating Account, net of any chargebacks and credit card fees from customer purchases.

43.     Generally, the Operating Account is used to pay the payroll, operating expenses, debt payments, utilities, and taxes for each of the Debtors.  These expenses paid from the Operating Account are initiated by the Debtors' financial personnel and paid to vendors and third parties via checks or electronic payments.  Amounts to be paid to employees or vendors via the Debtors' payroll account and the accounts payable account at Cadence Bank are swept from the Operating Account.  The payroll account and the accounts payable account at Cadence Bank are "zero balance accounts," meaning the accounts are swept daily into and out of the Operating Account to bring the account to a zero balance.

44.     The Debtors propose to continue using the bank accounts described in the Cash Management Motion and in Exhibit 1 after the Petition Date, subject to their right to open and close certain accounts in their discretion.

45.     In the ordinary course of business, the Debtors also routinely engage in certain intercompany financial transactions by and between different Debtor entities (collectively, the

14

"Intercompany Transactions").  Intercompany Transactions may arise from one Debtor entity's payment of accounts payable, or payroll owed by another Debtor or one Debtor's receipt of accounts receivable payments due to another Debtor.  At any given time, as a result of Intercompany Transactions, there may be claims owed by, or owed from, one Debtor to another. The Debtors also maintain business relationships with a certain non-debtor affiliate arising from shared services that are provided to reduce overall general and administrative costs, that result in fund transfers in the ordinary course of business (collectively, the "Non-Debtor Affiliate Transactions").

46.     The Intercompany Transactions and Non-Debtor Affiliate Transactions are essential components of the Debtors' operations and centralized Cash Management System.  Any interruption of the Intercompany Transactions and Non-Debtor Affiliate Transactions would severely disrupt the Debtors' operations and result in great harm to the Debtors' estates and their stakeholders.  Accordingly, the Debtors seek authority – and, to the extent applicable, relief from the automatic stay – to continue the Intercompany Transactions and Non-Debtor Affiliate Transactions in the ordinary course of business on a postpetition basis, in a manner substantially consistent with the Debtors' past practice.

47.     I believe that because of the disruption that would result if the Debtors were forced to close their existing bank accounts, it is critical that the existing Cash Management System remains in place.  The Debtors' continued use of their Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies, expenses, and distraction associated with disrupting this system and minimizing delays in the payment of postpetition obligations.  I do not believe that parties in interest will be harmed by the Debtors' maintenance of their existing Cash Management System, specifically maintenance of

15

existing bank accounts and use of existing Business Forms, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.

48.     I believe that the Debtors' business will operate more efficiently using an integrated, centralized Cash Management System to manage the cash of operating units in a cost-effective manner as the Debtors have been doing historically.  This includes using the system in the ordinary course to collect, transfer, and disburse funds.  Because the Debtors have historically operated with such a system, any disruption to the system would have a sharply adverse effect on operations and thus highly detrimental to the Debtors' estates and their creditors.  Therefore, in my business judgment, the Cash Management System should be preserved on a post-petition basis.

49.     Further, if the Intercompany Transactions and Non-Debtor Affiliate Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.

50.     Lastly, I believe authorizing the Debtors to continue use of their existing Cash Management System is necessary to avoid immediate and irreparable harm to the Debtors. Authorizing the Debtors to maintain their Cash Management System as proposed is integral to the Debtors' ability to transition their operations into these chapter 11 cases and necessary for the Debtors to continue business operations uninterrupted and preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders.  Failure to receive such immediate authorization on an interim basis would severely disrupt the Debtors' ability to administer their estates at this critical juncture.

**D.   Cash Collateral Motion.**

51.     On the Petition Date, the Debtors filed their *Motion for Entry of Interim and Final*

*Orders Authorizing Use of Cash Collateral* ("Cash Collateral Motion").  The Debtors request entry of interim and final orders (collectively, the "Cash Collateral Orders") (a) authorizing the Debtors to use "Cash Collateral," as defined in 11 U.S.C. § 363(a); (b) granting adequate protection to prepetition loan parties; (c) modifying the automatic stay imposed by 11 U.S.C. § 362 to the extent necessary to implement and effectuate the terms of the Cash Collateral Orders; and (d) granting related relief.

52.     The Debtors acknowledge all of their cash, negotiable instruments, deposit accounts, or other cash equivalents in any form, including, without limitation, income, proceeds, products, revenues or profits of property or cash arising from the collection, sale, lease, disposition, use, or conversion to cash of any property, or fees, charges, accounts, or other payments, and such other forms of property as are contemplated under 11 U.S.C. § 363, constitute cash collateral of Cadence Bank governed by 11 U.S.C. § 363, whether Cadence Bank's liens or security interests (including, without limitation, any replacement liens or security interests) existed on the Petition Date or arise thereafter, and whether such property that has been converted to cash existed as of the Petition Date or arose or was generated thereafter (collectively, the "Cash Collateral").  Further, the Debtors acknowledge all of their cash and cash equivalents, including any cash in deposit accounts, wherever located, and all cash that constitutes proceeds of Prepetition Collateral (as defined in the Loan Documents) are part of the Prepetition Collateral and constitute Cash Collateral subject to the Prepetition Liens of Lender.

53.     The Debtors lack sufficient funds to support their continued operations during the chapter 11 cases unless they are authorized to use Cash Collateral.  Based on my work in developing the Debtors' budget, they will need access to Cash Collateral to ensure that they are able to continue operating their businesses during these chapter 11 cases and pursue a value-

maximizing restructuring process.  Without use of the Cash Collateral, the Debtors' operations will be brought to an immediate halt, with damaging consequences for the Debtors and their bankruptcy estates and creditors.  Without prompt access to Cash Collateral, the Debtors will be unable to satisfy payroll obligations, satisfy trade payables incurred in the ordinary course of business, or fund the administration of these chapter 11 cases.  This would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

54.     Therefore, the Debtors, with the agreement and consent of Cadence Bank, propose to use Cash Collateral on an interim basis until such time as the Court schedules a Final Hearing on the use of Cash Collateral.  At the Final Hearing, the Debtors will seek relief to use Cash Collateral on a final basis during the term of the chapter 11 cases.

55.     Prior to the Petition Date, the Debtors and Cadence Bank engaged in good faith, arm's length negotiations for use of Cash Collateral on an interim basis under the terms and conditions contained in the attached proposed agreed interim order (the "Agreed Interim Cash Collateral Order").

56.     Together with the assistance of management and the MorrisAnderson team, I have assisted with the preparation of a cash flow forecast and budget for the use of Cash Collateral during the interim period, which is attached to the Debtors' proposed interim cash collateral order (the "Budget").  Based on my knowledge of the Debtors' business and value maximizing goals in these chapter 11 cases, I believe that the Budget establishes that the Debtors will have adequate liquidity during the interim period.  The Budget contains line items for cash anticipated to be received and disbursed during the time period covered by the Budget.  I believe that the Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of the Debtors' business as a bridge while the Debtors restructure.

57.     In order to obtain consent for use of Cash Collateral, Cadence Bank required an adequate protection package in the form of adequate protection liens and adequate protection superpriority claims.  The Cadence Bank further required certain case milestones to ensure that these chapter 11 cases move expeditiously through the restructuring process.  I believe that each form of adequate protection and the case milestones are appropriate under the circumstances. Continued access to Cash Collateral on the terms set forth in the orders will allow the Debtors to responsibly fund these chapter 11 cases, continue their business operations, and realize the benefits of a restructuring process with the oversight of the Bankruptcy Court for the benefit of the Debtors' creditors.

58.     In this case, immediate and irreparable harm would result if the relief requested in the motion is not granted on an interim basis pending the final hearing.  The Debtors have a critical need for use of Cash Collateral to pay operating expenses associated with its business operations. The Debtors lack sufficient available sources of working capital and financing to operate, reorganize or effectuate an orderly wind-down of its remaining business.  Use of the Cash Collateral is necessary to the Debtors' ability to preserve and maintain going concern value of their businesses for the benefit of creditors and all parties in interest.  Without the use of the Cash Collateral, the Debtors will have insufficient funding to permit, among other things, the orderly continuation of the operation of its businesses, maintain business relationships with vendors, suppliers and customers, make payroll, and satisfy other working capital needs and other costs associated with Debtors' business operations.   Absent the relief requested herein, the Debtors' operations will be brought to an immediate halt, with damaging consequences for the Debtors' and their bankruptcy estates and creditors.  Accordingly, the use of Cash Collateral during the interim period is necessary to avoid immediate and irreparable harm to the Debtors' bankruptcy estates.

### E.  **Prepetition Wages Motion.**

59.     On the Petition Date, the Debtors filed their *Motion for Authority to (a) Pay Prepetition Employee Wages, Salaries and Compensation (b) Pay All Costs and Expenses Related to Such Payments, and (c) Authorizing Financial Institutions to Honor Such Payments* (the "Prepetition Wages Motion").  The Debtors seek an order of the Bankruptcy Court, pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Rule 6003 of the Federal Rules of Bankruptcy Procedure, (i) authorizing, but not requiring, payment of prepetition wages, employee benefits and expense reimbursement, (ii) authorizing and directing banks to honor checks with respect thereto, and (iii) authorizing, but not requiring, payment of post-petition wages, employee benefits and expense reimbursement.

60.     The Prepetition Wages Motion seeks authority to pay the Debtors' collective 2,248 employees, the wages, compensation and benefits earned during the prepetition period (as set forth more specifically in the Prepetition Motion), as well as to continue making such payments in the ordinary course of its business. Approximately 2,055 Employees are compensated on an hourly basis and there are approximately 193 Employees who receive a salary.  The majority of the Employees consist of the Debtors' part-time Restaurant crew members.  The Employees also include district managers, restaurant general managers, restaurant managers, restaurant managers in training and shift leaders.  None of the Employees are subject to a collective bargaining agreement or any similar labor agreement.

61.     As of the Petition Date, the Debtors will owe Employees approximately $936,637 in gross wages earned between April 25, 2023 and the Petition Date, to be paid on May 12, 2023 (the "Prepetition Payroll Obligations").  Although the Prepetition Payroll Obligations are for wages earned by these Employees during a prepetition period, the Debtors intend, and through this

motion seek authority from the Court, to pay the full Prepetition Payroll Obligations, along with all other wages owed to Employees for the April 25, 2023 through May 8, 2023 payroll period (*i.e.*, wages earned between the Petition Date and May 8, 2023) in the ordinary course of the Debtors' business operations on or about May 12, 2023, to ensure Employees timely receive the full amount of their wages.

62.     In addition to the Prepetition Payroll Obligations, which consist of wages and salaries owed by the Debtors, the Debtors offer their Employees the ability to participate in a number of insurance and benefits programs, including, among other programs, medical, prescription drug, dental, and vision plans, life insurance, workers compensation, accidental death and dismemberment insurance, disability benefits, employee assistance programs, retirement plans, and paid time off (collectively, the "Employee Benefits Programs").  The Debtors seek authority to continue honoring any obligations under the Employee Benefit Programs, and to pay any postpetition claims with respect thereto, in the ordinary course of business.  Additionally, and as part of the Employee Benefits Programs, the Debtors offer a Minimum Essential Coverage with Limited Indemnity Plan (the "MEC Plan") to hourly crew and shift leader employees through a company called Regional Care, Inc.  The MEC Plan is self-funded, but is constructed in such a way that the cost of claims have historically been covered by the premiums. Claims under the MEC Plan are routinely paid in the ordinary course of the Debtors' business, and it is anticipated that on the Petition Date certain additional employee health benefit claims under the MEC Plan have accrued and will become due and payable post-petition. The failure to continue the Employee Benefits Programs and fund the associated obligations could cause Employees to experience severe hardship.  In light of the substantial benefit the Employees have provided and will continue to provide to the Debtors' estates, the Debtors wish to avoid imposing such a hardship.

21

63.    The Employees include personnel who are intimately familiar with the Debtors'
business, processes, and systems, and possess unique skills and experience with the core business
segments of the Debtors.  Many of these Employees have developed relationships with customers
and vendors that are essential to the Debtors' business.  Without the continued, uninterrupted
services of the Employees, the Debtors' business operations will be halted and the administration
of the estates materially impaired.

64.    Many of the Employees rely on their compensation and benefits to pay their daily
living expenses. These workers will be unfairly harmed if the Debtors are not permitted to continue
paying compensation and providing health and other benefits during these chapter 11 cases.  Thus,
the Employees will be exposed to significant financial constraints if the Debtors are not permitted
to continue paying the Employees' compensation and providing the Employees with health and
other benefits.

65.    The Employees are vital to the Debtors' business operations and ability to operate
as debtors-in-possession during the pendency of the chapter 11 cases.  The Debtors' Employees
rely on their wages and compensation to pay for housing, food, and energy.  Failure to pay the
Employees their earned wages and compensation would result in substantial hardship to the
Employees.  Further, it is axiomatic that the continued loyalty of a debtor's employees is an
essential component to any successful reorganization.  Under the best circumstances, the filing of
a chapter 11 petition is a stressful and uncertain event for a debtor's employees.  Such stress and
uncertainty may adversely affect employee morale at a time when a debtor is particularly
vulnerable to business disruptions.  Low morale, and a perception that employees are receiving
less than favorable treatment, may result in many employees seeking employment elsewhere.  Such

22

a result in this case would negatively affect the value of the Debtors' business and the Debtors' ability to successfully reorganize.

66.     Further, payment of the Prepetition Payroll Obligations is necessary for the Debtors to keep the Employees with the company and necessary to avoid immediate and irreparable harm to the Debtors' business.  Should the Debtors be unable to pay these obligations, the Employees may seek employment elsewhere, including from competitors of the Debtors.  Such a result would have immediate negative impacts on the Debtors' ability to continue operations as debtors-in-possession during chapter 11 and would cause irreparable harm to the value of the Debtors' business and the Debtors' ability to successfully reorganize.  Accordingly, honoring the Prepetition Payroll Obligations in the ordinary course of business without interruption, will avoid any hardship to the Employees, encourage the Employees to continue their employment with the Debtors, and allow the Debtors to continue business operations with minimal disruption.

### F.  Prepetition Tax Motion.

67.     On the Petition Date, the Debtors filed their *Motion for Entry of Order Authorizing, but not Directing, the Payment of Certain Prepetition Taxes and Granting Related Relief* (the "Prepetition Tax Motion").   In the Prepetition Tax Motion, the Debtors seek authorization, pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), 541, 1107(a), and 1108 and Fed. R. Bankr. P. 6003 and 6004, to, in their sole discretion, remit and pay certain accrued and outstanding prepetition sales and use taxes.

68.     In the ordinary course of the Debtors' business, the Debtors collect, incur, and remit and pay sales and use taxes in connection with the volume of sales at the Restaurants (the "Sales

and Use Taxes").[3] The Debtors remit the Sales and Use Taxes to various federal, state, and local governments, including taxing authorities (collectively, the "Governmental Authorities"). A schedule identifying the Governmental Authorities is attached to the Prepetition Tax Motion as Exhibit 1. The Sales and Use Taxes are remitted and paid by the Debtors through checks and electronic transfers that are processed through their banks and other financial institutions. Generally, the Debtors collect and remit the Sales and Use Taxes to the relevant Governmental Authorities in arrears one month after the taxes are assessed. For example, the Sales and Use Taxes incurred by the Debtors for the month of April are to be paid by the Debtors in May. Three states differ from the general payments in arrears one month after the taxes are assessed: (i) in Missouri, the Debtors prepay monthly Sales and Use Taxes to the applicable Governmental Authorities, (ii) in Georgia, the Debtors maintain deposits with the applicable Governmental Authorities, and (iii) in Florida, the Debtors prepay monthly Sales and Use Taxes that are reconciled with a final payment invoice. As of the Petition Date, the Debtors believe that approximately $990,000 in Sales and Use Taxes relating to the prepetition period are due and owing to the Governmental Authorities after the Petition Date in the ordinary course.

69. The Debtors are responsible for such priority tax payments because the Sales and Use Taxes are collected or withheld by the Debtors on behalf of the applicable Governmental Authorities and are held in trust by the Debtors. Because the Debtors may not have an equitable interest in funds held on account of such "trust fund" taxes, the Debtors should be permitted to pay those funds to the Governmental Authorities as they become due.

---

[3] The Debtors note Kansas City, Missouri also assesses convention and tourism taxes, which are treated similarly to a sales tax, collected from customers at the Debtors' points-of-sale and remitted to the taxing authority. For purposes of the Prepetition Tax Motion, the defined term "Sales and Use Taxes" shall encompass the pre-petition convention and tourism taxes due to be remitted to Kansas City, Missouri.

4885-3602-7744, v. 7

70.     The Debtors' ability to pay the Sales and Use Taxes is essential to the orderly administration of the chapter 11 cases, continuing the Debtors' operations during the chapter 11 cases, and maximizing the value of the Debtors' estates for the benefit of their stakeholders. If Sales and Use Taxes remain unpaid, Governmental Authorities may seek to impose liens or penalties on the Debtors, the Debtors' assets, their directors, officers, or employees, thereby distracting them from the administration of the Debtors' chapter 11 cases. Any collection action on account of such penalties, and any ensuing liability, would distract the Debtors and their personnel to the detriment of all parties in interest.

71.     Furthermore, the Debtors' liability to pay the Sales and Use Taxes may ultimately result in increased tax liability for the Debtors if interest and penalties accrue on the tax claims. The Sales and Use Taxes may be entitled to priority status pursuant to § 507(a)(8)(C). As priority claims, these obligations must be paid in full before any general unsecured obligations of the Debtors may be satisfied. To the extent that the Debtors are unable to timely pay the prepetition Sales and Use Taxes, they may ultimately be required to pay those amounts with additional interest and penalties. The Debtors' failure to pay the prepetition Sales and Use Taxes as they come due thus may ultimately increase the amount of priority claims, held by the Governmental Authorities against the Debtors' estates to the detriment of the Debtors' other creditors.

72.     As set forth above, payments for Sales and Use Taxes are necessary to facilitate the rehabilitation of the Debtors, preserve value as a going concern, and allow the Debtors to continue business operations with minimal disruption and proceed with the critical task of stabilizing its operations and pursuing a successful chapter 11 reorganization.

73.     Here, the relief requested is necessary to avoid immediate and irreparable harm to the Debtors' business for the reasons set forth above.   Authorizing the Debtors to pay the Sales

and Use Taxes accrued prior to the Petition Date and granting the other relief requested herein is integral to the Debtors' ability to transition into the chapter 11 cases. An inability to timely pay Sales and Use Taxes would have immediate negative impacts on the Debtors' ability to continue operations as a debtor-in-possession during chapter 11 and would cause irreparable harm to the value of the Debtors' business and the Debtors' ability to successfully reorganize.

74.     For the reasons discussed herein, the relief requested is necessary in order for the Debtors to preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### G. **Critical Vendor Motion.**

75.     On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Authorizing, but not Directing, (I) Payment of Prepetition § 503(b)(9) Claims, (II) Payment of Prepetition Claims Arising Under the Perishable Agricultural Commodities Act and the Packers and Stockyards Act of 1921, and (III) Granting Related Relief* (the "Critical Vendor Motion").

*(i)     Critical Vendor Claims.*

76.     In the ordinary course of the Debtors' business operations, the Debtors must have an uninterrupted supply and use of materials, equipment, and food products used to make and package the food sold in the Restaurants. For example, in order to fulfill customer orders, the Debtors must have on hand, among other supplies and inventory, packaging, condiments, paper products, and food products. The suppliers and providers of these products are critical to the Debtors' continued business operations. Without an uninterrupted supply of such products, the

26

Restaurants would cease operations.

77.     The Debtors, as restaurant franchisees, are rather unique in the relationship of trade creditors to a franchise business.   Unlike most businesses, the franchise owner Debtors and management do not have the ability to change suppliers for the vast majority of the products and services they use because the franchisor requires that the franchisee use certain "broadline" food and supply vendors and/or the franchisor has unique specifications that are required relative to food products and supply items (e.g., the use of the brand name on a cup) that franchisees must comply with or risk violating their franchise agreement. These requirements make it either impossible to re-source to an alternate supplier or very difficult and slow to re-source to an alternate supplier.   Further, the Debtors have contracts with service suppliers to service all of their Restaurants or at least groups of their Restaurants in a geographic region. Services include, but are not limited to, physical security, cash control/safes, uniforms, equipment repair, snow removal, landscaping, and other services.

78.     A large number of these product and service providers, as a practical matter, cannot be replaced, or at a minimum cannot be replaced quickly. Because the Restaurants typically get product deliveries twice weekly and have space to store less than one week of inventory, product suppliers have the capability of shutting down a restaurant simply by not delivering for a week. Service providers have similar leverage akin to a longer-term disruption to restaurant operations. The net impact in this industry unique situation is that the vast majority of unsecured trade creditors to a large restaurant franchisee in a chapter 11 case hold more leverage than a typical unsecured trade creditor.   The least disruptive way for the Debtors to manage this unique restaurant dynamic and the best value preservation way is to provide certain necessary creditors with critical vendor status.

4885-3602-7744, v. 7

79.     Moreover, the Debtors have remained current on pre-petition obligations to Critical Vendors, such that all prepetition Critical Vendor Claims are on account of goods that were received by the Debtors in the ordinary course of their businesses within the twenty-day period before the Petition Date.

80.     All Critical Vendor Claims relate to goods received by the Debtors within twenty days prior to the Petition Date, and are entitled to priority under § 503(b)(9) which afford them administrative priority claim status.

81.     The Debtors have reviewed their accounts payable and prepetition vendor lists in order to identify those creditors most essential to their operations during these chapter 11 cases and the success of a sale of their assets (the "Critical Vendors"). As a franchisee, the Debtors are required to meet quality standards for the food products and other perishables it provides to its customers.  The Critical Vendors are necessary for the Debtors to maintain these quality standards in their Restaurants.

82.     Any interruption in the provision of the goods and services would immediately jeopardize the Debtors' continued ability to attract customers and sell food. If the Debtors cannot attract the volume of customers it projects under its cash collateral budget, the Debtors may find that their ability to access cash leaves them with insufficient liquidity. The Debtors' inability to operate efficiently and provide customers the quality of food they have come to expect will not only harm the Debtors' ability to operate during the case but also harm the prospects for competitive bidding for the Debtors' assets.

83.     The Debtors with the assistance of their professionals and advisors, identified the Critical Vendors by considering, among other things, whether a manufacturer, supplier, or service provider is the only provider of goods and services related to certain products, whether the Debtors

28

are required under franchise agreements to use a specific manufacturer, supplier, or service provider, and whether such a manufacturer, supplier, or service provider is able or likely to refuse to ship product or provide services to the Debtors or potential purchasers if their prepetition balances are not paid.   The Debtors also determined that it would be difficult, if not impossible, to replace the Critical Vendors in the event that the Critical Vendors ceased supplying postpetition due to unpaid prepetition debts.

84.     The Debtors propose that, as to each approved Critical Vendor, the Debtors would be authorized to pay such Critical Vendor's prepetition § 503(b)(9) claim in the ordinary course of business, and to pay any post-petition claims for receipt of goods assuming the Vendor continues to honor the same payment terms as offered pre-petition as this case proceeds.   In assessing strategies to continue doing business with the Critical Vendors, the Debtors have considered the availability of alternative protections for each Critical Vendor. Because many of the Critical Vendors are either mandated vendors or the only practical source of such goods and services, such payment alternatives are not available.

85.     The Debtors further believe they will be able to make the required payments to Critical Vendors and maintain all postpetition obligations as provided for in its proposed cash collateral budget submitted in connection with the Cash Collateral Motion and related budget.

86.     Thus, the Debtors seek authority, in their sole discretion, to pay those prepetition obligations owed to Critical Vendors under § 503(b)(9) (the "Critical Vendor Claims") in an amount not to exceed $1,200,000 ("Critical Vendor Interim Cap") on an interim basis and in an amount not to exceed $2,000,000 ("Critical Vendor Final Cap") on a final basis.   All Critical Vendor Claims relate to goods received by the Debtors within 20 days prior to the Petition Date and are entitled to priority under 11 U.S.C. § 503(b)(9).

87.     The failure of any Critical Vendor to deliver necessary goods and services to the Debtors would have immediate and detrimental consequences to the Debtors' continued business operations and would jeopardize the Debtors' efforts to preserve and maximize the value of their estates, to the detriment and prejudice of all of the Debtors' stakeholders. The Debtors' failure to satisfy the Critical Vendor Claims would cause the Debtors' estates immediate and irreparable harm by detracting from the Debtors' chapter 11 efforts.  Accordingly, authorizing the Debtors to pay Critical Vendor Claims is necessary to avoid immediate and irreparable harm to the Debtors. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' ability to administer their estates at this critical juncture. The relief requested is necessary for the Debtors to continue business operations uninterrupted and preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders.

*(ii)     PACA/PASA Claims.*

88.     In the ordinary course of the Debtors' operation of the Restaurants, the Debtors purchase a variety of consumable goods that are either sold directly to the Debtors' customers or are used in the preparation of certain prepared foods that are sold to customers. These consumable goods include, among other items, meat, poultry, dairy products, frozen foods, and produce, and are purchased from a diverse range of vendors, including agricultural growers (the "PACA/PASA Vendors").

89.     Prior to the Petition Date, certain of the PACA/PASA Vendors sold goods to the Debtors that may be deemed (i) "perishable agricultural commodities," as such term is defined under PACA, and/or (ii) "livestock," as that term is defined by PASA, and other eligible goods covered by state statutes of similar effect to PACA and PASA. To ensure that the Debtors continue to receive an uninterrupted supply of fresh fruits, vegetables, meat, poultry and other similar

30

consumable goods on a post-petition basis, the Debtors seek authority, but not direction, in their sole discretion, to pay prepetition claims held by PACA/PASA Vendors (the "PACA/PASA Claims") in the ordinary course of business and consistent with their historical practices, including amounts owed prior to the Petition Date.

90.     The Debtors believe that a certain portion of the goods received within twenty days from the Petition Date from some Critical Vendors may also qualify as "perishable agricultural commodit[ies]" under PACA or "livestock" under PASA.  As a result, insofar as those vendors abide by the notice requirements of PACA or PASA, as applicable, such vendor will be eligible to assert PACA/PASA Claims granting them the right to recover from the PASA Trust Assets or PACA Trust Assets as non-estate property. Accordingly, payment of PACA/PASA Claims at this time will not prejudice or affect the amount available for distributions to other creditors of the Debtors and do not disrupt the claim priorities of the Bankruptcy Code. To ensure that the Debtors continue to receive the supply of fresh fruits, vegetables, meat, poultry and other similar consumable goods that is necessary to continue the Debtors' business operations, and to avoid liability for failure to pay the PACA/PASA Claims, it is imperative that the Debtors be authorized to pay the PACA/PASA Claims in the ordinary of business and consistent with their historical practices

91.     As of the Petition Date, the Debtors estimate that aggregate amount of the PACA/PASA Claims is approximately $200,000 for goods delivered prior to the Petition Date. To ensure that the Debtors' supply of produce, meat, poultry, and other similar products continues uninterrupted and without delay during the chapter 11 cases and to ensure that they do not incur liability for nonpayment, the Debtors request authority to pay all PACA/PASA Claims in the ordinary course of business, when due, and consistent with their historical practices.

4885-3602-7744, v. 7

92.    The failure of any PACA/PASA Vendor to deliver necessary goods and services to the Debtors would have immediate and detrimental consequences to the Debtors' continued business operations and would jeopardize the Debtors' efforts to preserve and maximize the value of their estates, to the detriment and prejudice of all of the Debtors' stakeholders. Thus, if the relief requested herein is not granted, the Debtors' failure to satisfy the PACA/PASA Claims would cause the Debtors' estates immediate and irreparable harm by detracting from the Debtors' chapter 11 efforts.

93.    The Debtors submit that for the reasons already set forth herein, the granting relief requested in this motion is necessary to avoid immediate and irreparable harm to the Debtors. Authorizing the Debtors to pay PACA/PASA Claims is integral to the Debtors' ability to transition their operations into these chapter 11 cases.  Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' ability to administer their estates at this critical juncture.  The relief requested is necessary for the Debtors to continue business operations uninterrupted and preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders.

## CONCLUSION

94.    I believe that the protection of the Bankruptcy Court will enable the Debtors to maximize the value of their assets for the benefit of the Debtors' estates and their creditors.

95.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

 Dated this 4th day of May, 2023

32

4885-3602-7744, v. 7

Daniel F. Dooley

4885-3602-7744, v. 7